UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                 File No. 1:15-cr-28

v.

                                 HON. JANET T. NEFF

CHARLES PATRICK GAHAN,

       Defendant.

_____/

## OPINION

Defendant Charles Patrick Gahan is serving a 70-month prison sentence for conspiracy to commit wire fraud affecting financial institutions, 18 U.S.C. §§ 1343, 1349. Before the Court is Defendant's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, and supplement thereto (ECF Nos. 50, 56). Plaintiff has filed a response arguing that the grounds for relief are meritless and/or procedurally defaulted (ECF No. 67). Defendant has filed several replies and additional supplements to his motion for relief (ECF Nos. 68, 69, 70, 71, 73, 75, 77, 80, 81, 84, 86, 90). Upon review, the Court finds that the motion is meritless. Accordingly, the motion will be denied. The Court will also deny Defendant's motions to appoint counsel, to obtain release on bond, to obtain discovery, and to receive a timely ruling. An order and judgment will enter in accordance with this Opinion.

## I. BACKGROUND

The charges against Defendant stemmed from his actions in concert with Scott Hoeft to defraud mortgage lenders and real estate title companies. Defendant operated a real estate development business, GBW Development, LLC. GBW acquired land, built homes, and sold

those homes to the public. Scott Hoeft owned and operated a title insurance company, Prime Title Services LLC. Prime Title provided real estate closing services and title insurance. Hoeft was authorized to issue title insurance on behalf of Old Republic National Title Insurance Company ("Old Republic") and First American Title Insurance Company ("First American"). Before issuing a title insurance policy for a property subject to a sales agreement, it was his responsibility to determine whether a property was encumbered by any liens or prior interests. He would then report the results of his investigation in a title commitment to the parties to the real estate transaction.

According to the Presentence Investigation Report in Defendant's case (PIR, ECF No. 32), and Defendant's admissions at his plea hearing (Plea Hr'g Tr., ECF No. 29), Defendant and Hoeft conspired with one another in 2002 to defraud financial institutions by failing to disclose existing liens on properties in title commitments, failing to pay off the liens after the closing, and/or failing to record new liens. Defendant and Hoeft did this in a number of mortgage transactions, including those involving several of Defendant's personal residences. With help from Hoeft, Defendant secured new mortgages on residences own by Defendant and his wife without disclosing existing mortgage liens. By doing so, Defendant and his wife were able pocket proceeds from the new loans without paying off the underlying mortgages.

In addition, with Hoeft's help, GBW obtained additional funds to acquire land and build new homes. Defendant sold homes built by GBW without disclosing the underlying land and construction mortgages. On other occasions, Defendant and Hoeft disclosed the underlying liens, but did not pay them off. Prime Title deposited the funds that should have been used to pay off the liens in its escrow account, in a ledger called GBW Development. GBW used those proceeds to fund further construction and development.

Later, Defendant and Hoeft took advantage of a "daily float" in Prime Title's escrow account (PIR, ECF No. 32, PageID.147), which occurred because Prime Title received funds by wire to pay closing costs, but issued paper checks to pay the costs. It took several days for the checks to clear. Defendant opened a foreign currency trading account at Forex.com. In April and May 2005, Hoeft transferred various amounts totalling $700,000 from Prime Title's escrow account to Defendant's trading account. Defendant would use that money over a weekend to obtain a profit in trading currencies, and then transfer the money back to Prime Title, sharing some of the profits with Hoeft.

In August or September 2005, Prime Title transferred additional money from its escrow account directly to Defendant's bank account. Defendant claimed that the money would be used for a condominium development, but much of that money was used for Defendant's personal living expenses.

In 2005, lien holders started to discover that their mortgage liens had not been paid off, even though GBW had already sold the underlying homes. In addition, the homeowners began contacting their title insurers, Old Republic and First American, because they were facing foreclosure proceedings from financial institutions that, to the homeowners' knowledge, did not have an interest in their homes. Old Republic and First American eventually paid out over $8,000,000 to settle mortgages and pay off insurance claims from homeowners who did not have clear title to their homes.

In November 2012, Hoeft pleaded guilty to conspiracy to commit wire fraud affecting financial institutions. *United States v. Hoeft*, 1:12-cr-266 (W.D. Mich.). He cooperated with the Government and later testified against Defendant at a grand jury proceeding.

In January 2014, the Government notified Defendant that he was the target of a grand jury investigation involving a conspiracy to defraud banks and mortgage lenders. (Target Letter, File No. 1:14-mj-55 (W.D. Mich.), ECF No. 1.) The Court appointed Sean Tilton to represent him.

According to the Government, in April 2014, Defendant participated in a proffer interview in which he acknowledged conspiring with Hoeft to divert funds from the closing of real estate sale transactions to their personal accounts rather than paying off the outstanding debt on the properties. (Pl.'s Resp. 5, ECF No. 67, PageID.621; PIR, ECF No. 32, PageID.151.) However, Defendant repeatedly questioned how he could be liable for over $8,000,000 in losses because he did not receive nearly that amount of money from the scheme. (*See* Emails, ECF No. 51-2, PageID.372-375, 386, 396.) For instance, in emails to his attorney that month, Defendant questioned the veracity of the amount of losses claimed by the insurance companies because he did not trust their calculations; he also wanted to see evidence that funds were actually deposited into his personal account, even though his guilt was not dependent upon such deposits. (*Id.*, PageID.373-375.) He also claimed that he did not want to be "the only person on the hook" because he had "an equal [business] partner that knew the money was coming from Scott Hoeft and his Title company." (*Id.*, PageID.373.)

Around that time, Defendant was considering entering into a plea agreement, but he suggested delaying it in order to determine what he could "bring to the table" to the Government regarding information he possessed about an unrelated "stock scam" in Florida. (*Id.*, PageID.375.) Looking back a few months later, he indicated that his "strategy" was to cooperate with the Government so that the prosecutors would "believe his claims of a limited role with Scott Hoeft"

and have sympathy on Defendant by "giving weight to the circumstances [Defendant] had in his business." (*Id.*, PageID.380.)

Meanwhile, Tilton was negotiating the terms of a plea agreement that would not waive Defendant's right to an appeal. (*Id.*, PageID.377.)

In August, the Government filed a felony information charging Defendant with conspiracy to commit wire fraud affecting financial institutions. (*See United States v. Gahan*, 1:14-cr-152 (W.D. Mich.), ECF No. 1.) That same month, Defendant signed a plea agreement stipulating to the following facts about his conduct:

> From in or about October 2002, to in or about January 2006, the Defendant conspired with Scott Hoeft to commit wire fraud against financial institutions, private lenders, and title companies. As charged in the Information, Defendant, while operating as a real estate developer under the name of GBW Development, utilized monies from real estate closings to which he was not lawfully entitled to build more homes and expand his real estate development business. Defendant executed his scheme by conspiring with Scott Hoeft, an independent title insurance and closing agent, who operated under the name of Prime Title Services L.L.C. In furtherance of the conspiracy, Defendant and Mr. Hoeft defrauded financial institutions and private lenders through several means, including: (1) by failing to provide them with accurate title commitments that disclosed all existing liens against the property; (2) by accurately disclosing the liens but not actually paying off the liens off after the closing; and, (3) by simply failing to record new liens with the county register of deeds. Defendant also conspired with Mr. Hoeft to carry out the same fraud scheme against various financial institutions and private lenders that provided financing for his own personal residences.
>
> The fraud scheme allowed Defendant to instruct Mr. Hoeft to divert proceeds from the real estate closings to Defendant's business and personal bank accounts instead of to the financial institutions and private lenders who should have received the proceeds to retire their existing liens. Defendant used these funds for his own personal benefit and to continue to expand his real estate developments by building and selling additional single-family residences. Ultimately, because these residences were subject to liens that were not of record, or that were of record but not properly extinguished as part of the closing, many innocent purchasers received foreclosure notices against their properties. As a result, Old Republic National Title Insurance and First American Title Insurance were forced to defend these innocent purchasers and pay off the existing liens in order to ensure that the purchasers had clear title to their homes.

> As a direct result of Defendant's fraudulent actions, the victim lenders and title companies suffered a loss of more than $7,000,000 but less than $20,000,000.

(File No. 1:14-cr-152, ECF No. 4, PageID.14-15.)

The Court scheduled a plea hearing for October 8, 2014, but that hearing was cancelled and rescheduled for November 19. (File No. 1:14-cr-152, ECF No. 8.) A few weeks later, the November 19 hearing was cancelled. (File No. 1:14-cr-152, ECF No. 11.) Apparently, Defendant cancelled the hearing because he continued to have concerns about the loss estimate. He told his attorney that he could not "plead guilty to the inaccurate felony information or the statement of fact concerning (estimated and exaggerated) financial losses, based on third party accountant generated letter, spreadsheets, and internal documents written by Scott Hoeft." (ECF No. 51-2, PageID.386.)

In February 2015, a grand jury returned an indictment charging Defendant with conspiracy to commit wire fraud affecting financial institutions, and a warrant was issued for his arrest. (ECF No. 1.) A jury trial was set for May 18, 2015.

Defendant received a copy of discovery documents from his attorney's office on April 22, 2015. (ECF No. 51-2, PageID.389.) Defendant wrote his attorney complaining that Hoeft is a "career liar"; Defendant claimed that he could provide "dozens of examples that I would expect to sho[o]t down these charges," including the fact that Defendant executed a promissory note when accepting money from Hoeft/Prime Title. (*Id.*) Apparently, Defendant mistakenly believed that he did not conspire to defraud anyone because he intended to repay the funds he accepted from Hoeft.

At the end of April, Tilton informed Defendant by letter that his office would like to interview Defendant's wife because "she could have relevant information about [Defendant's] case and could be either a defense or government witness." (*Id.*, PageID.393.) About a week later,

Defendant's wife received a "target letter" from the Government indicating that she was being investigated and could be charged for her involvement in Defendant's conduct. (*See* Emails, ECF No. 51-2, PageID.396-398.)

On May 18, 2015, Defendant signed a revised plea agreement. (ECF No. 22.) In the new plea agreement, Plaintiff agreed not to bring charges against Defendant's wife. This new plea agreement contained a stipulation of facts virtually identical to the one in the previous agreement. (*Id.*, PageID.71-72.) In addition, like the previous agreement, the revised plea agreement contained an affirmation by Defendant that the agreement was entered into "freely, knowingly, and voluntarily," that "No one has threatened for forced me in any way to enter into this agreement," and that "I am satisfied with the representation of my attorney in this matter." (*Id.*, PageID.79-80.)

On June 8, 2015, Defendant formally pleaded guilty to the charges at a hearing before Hon. Robert Holmes Bell. At this hearing, Defendant made representations under oath similar to those in the plea agreement. He affirmed the Court's description of the basis for his conviction, which is that he

> did intentionally fail to disclose on title commitments prior recorded liens and mortgages, and . . . in the process of failing to record lenders' mortgages, that in fact significant financial losses occurred to various entities as a result of [his] failure to forthrightly execute the appropriate documents in order and to the parties who are entitled to them.

(Plea Hr'g Tr. 4, ECF No. 29.) When asked to describe his conduct in his own words, Defendant stated:

> I conspired with Scott Hoeft and Prime Title. I – my company was growing very rapidly and we were short on funds, and we – at a closing, if property has an underlying mortgage that's to be paid off and the new money goes to pay off that underlying mortgage, which I would have had underlying construction loans, land loans, those types of things, those loans were not paid off and the money went back

into myself or to the business to pay for items that we were short on covering.  I participated in that and directed that and carried it out.

(*Id.* at 8.)  He also told the Court, "I came up with this on my own because I knew it was wrong." (*Id.* at 12.)

Defendant also acknowledged that the title insurance companies suffered losses from his conduct.  (*Id.* at 11, 13-14.)  According to Defendant, the insurance companies had to pay out "roughly eight million dollars."  (*Id.* at 14.)  When asked whether that amount surprised him, he responded, "No, I – no, not really."  (*Id.*)

Finally, Defendant affirmed that he had a "thorough opportunity to investigate [the charge] and to confer with [his] lawyer regarding the status of [the charge,]" and that he was satisfied with his attorney's representation of him.  (*Id.* at 3, 6.)  Defendant denied that anyone had "threatened" or "coerced" him to plead guilty.  (*Id.* at 7.)  Instead, he affirmed that his plea was "undertaken freely and voluntarily."  (*Id.*)  The Court accepted Defendant's plea.

A few days after the plea hearing, Defendant expressed some regret about entering a guilty plea.  He wrote to Tilton that the plea "was the worst thing I could have ever done.  Now I am painted with the guilt that Hoeft and his insurance companies made up in the beginning." Defendant vowed to "do something about this."  (Email, ECF No. 51-2, PageID.402.)

Helen Nieuwenhuis replaced Tilton as Defendant's attorney in August 2015, two months after the plea hearing.  Defendant continued to question the $8,000,000 loss amount.  He wrote to Nieuwenhuis complaining that Tilton did not adequately investigate how much "actual money" Defendant and his company received from the fraud scheme.  (Email, ECF No. 51-2, PageID.407.)  He claimed that he and his company received only $500,000, and that all the money that went into his Forex account was returned to Prime Title.  (*Id.*, PageID.407-408.)  She responded that if Defendant wanted to object to the loss amount, he could do so.  However, he had

already testified to that amount under oath. Consequently, if he raised objections, he risked a determination by the Court that he had engaged in perjury and risked losing credit for acceptance of responsibility. (Email, 51-2, PageID.410.) A week later, on October 22, Nieuwenhuis asked Defendant for an update on what he wanted to do about objecting to the loss amount. (*Id.*, PageID.411.) Defendant responded, "Just let it go as is." (*Id.*)

On November 4, 2015, Judge Bell sentenced Defendant to 70 months in prison followed by 5 years of supervised release. (J., ECF No. 38.) The Court also ordered him to pay $8.2 million as restitution. (*Id.*)

At the sentencing hearing before Judge Bell, Defendant again affirmed his guilt and responsibility for his conduct:

> THE COURT: . . . Go on and tell me something about this case and about you. I see a lot of the word "mistakes" in this. Is this a case of mistakes on your part?
>
> DEFENDANT GAHAN: No.
>
> THE COURT: What is it a case of?
>
> DEFENDANT GAHAN: Greed.
>
> THE COURT: Yeah, we're getting closer. What else?
>
> DEFENDANT GAHAN: Going back to your --
>
> THE COURT: Don't tell me what I want to hear. Tell me what you believe. You're a salesman. I know you are.
>
> Tell me what you believe you were doing. You were greedy.
>
> DEFENDANT GAHAN: Greed.
>
> THE COURT: What else?
>
> DEFENDANT GAHAN: I was – I guess I had bought into the early success of the building business and bought into my own interpretation or my own pat on the back that I was that good.
>
> THE COURT: What do you mean by that good? You could pull it off, right?

DEFENDANT GAHAN: Yeah. I'm that guy. I'm good enough. I'm – I can do this. This is -- you know, in examining my behavior and looking at this case and the things that I had done, I attribute it to greed. I attribute it to thinking that, you know, I can get through this. I'm that good.

THE COURT: But this was over quite a span of time, wasn't it?

DEFENDANT GAHAN: 2002 a little bit, but then it – you know, 2003 and 2004 were as it, you know, kind of mushroomed, exploded, where I found myself just so far over my head that I was just hell-bent to fix it.

THE COURT: How would you have fixed it?

DEFENDANT GAHAN: I – well, I was trying to get new projects going to cover what had happened here, what I had done.

THE COURT: You had to – you had to pay off the old projects that you were short on with monies that you pulled out of the new projects unlawfully.

DEFENDANT GAHAN: Yes.

***

THE COURT:  You knew what the lawful way would be to do and how much you would make if you did it carefully and lawfully, and then you calculated how with the time differential between these transactions you could make money, and by the time you finished one, you would have enough money to cover the others.  You calculated that all out, didn't you?

DEFENDANT GAHAN:  Yes, I did.

(Sentencing Hr'g Tr. 14-16, ECF No. 45.)

Defendant also described his recognition of wrongdoing:

DEFENDANT GAHAN: . . . I guess since receiving contact from the U.S. Attorney in February of 2014, that has required me to really honestly look at everything, get out all the old boxes and study these with a sober head, with a clear head, and look and know that the gig is up. You know, for the previous eight years I had gone to bed every night thinking is tomorrow the day from the time of this relationship and business with Scott Hoeft. . . .

***

And by this process taking this long, it has just – it's – it just made me realize the depth and the wrongfulness, the badness. I can't think of the word to really make it fit right this second. You know, just the disgustingness, the selfishness of what I did. . . . I feel it. You know, I know it rather than being in this, Oh, that didn't happen, this didn't happen type of justifiable delusional mentality.

\*\*\*

And in all of these realizations, I've come down especially in the last probably three or four months of looking at the affected people in this and the insurance companies lost a great deal of money and that's affected their bottom line and employees and people's lives that I've never met and don't know. They didn't deserve that from me. They don't know me. I don't know them. Why would I do that to innocent people?

(*Id.* at 19-20, 22.)

The Court also asked Defendant whether he had an opportunity to review the PIR and discuss it with his counsel. (*Id.* at 3.) Defendant confirmed that he did. The Court asked him whether he was "satisfied with [his attorney's] representations of [him]," and Defendant affirmed that he was. (*Id.*)

Defendant would now like the Court to believe that what he said at the guilty plea and sentencing hearings was a lie. He claims that he is innocent. He claims that he is entitled to relief under § 28 U.S.C. 2255 because he received ineffective assistance of counsel and the because prosecutor engaged in misconduct.

## II. STANDARDS

### A. Merits

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of

constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)). Non-constitutional errors are generally outside the scope of § 2255 relief. *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000). A petitioner can prevail on a § 2255 motion alleging non-constitutional error only by establishing a "fundamental defect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (internal quotations omitted)).

### B. Evidentiary Hearing

After reviewing the motion under § 2255 and other materials submitted by Defendant, the response by the Government, and the record of the prior proceedings, the Court must determine whether an evidentiary hearing is warranted. Rule 8, Rules Governing Section 2255 Proceedings. If there is a factual dispute, then the Court "'must hold an evidentiary hearing to determine the truth of the [defendant's] claims.'" *Pola v. United States*, 778 F.3d 525, 532 (6th Cir. 2015) (quoting *Huff v. United States*, 734 F.3d 600, 607 (6th Cir.2013)). An evidentiary hearing is "mandatory" unless "'the record conclusively shows that the [defendant] is entitled to no relief.'" *Id.* (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

### C. Discovery

"'Habeas petitioners have no right to automatic discovery.'" *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1991) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that the Court "*may, for good cause,*

authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) (emphasis added).

To demonstrate good cause, Defendant must provide "'*specific allegations . . . [that]* show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore, entitled to relief[.]'" *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (emphasis in original). "'The burden of demonstrating the materiality of the information requested is on the moving party.'" *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Stanford*, 266 F.3d at 460). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Id.* (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)).

### III.  ANALYSIS

In his motion under § 2255, Defendant raises two primary grounds for relief, but additional grounds are asserted in various supplements to his motion.

***Ground One:*** **Ineffective assistance of counsel**

Defendant contends that his trial attorneys provided ineffective assistance in various ways before and after his plea.  Sean Tilton represented Defendant before and at the time of Defendant's plea hearing.  Helen Nieuwenhuis replaced Tilton as Defendant's counsel two months after the plea hearing.

A claim of ineffective assistance of counsel is subject to the two-prong test in *Strickland*.  The first prong (the "performance" prong) requires Defendant to show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  Under this prong, the Court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

The second prong (the "prejudice" prong) requires Defendant to show that his counsel's deficient representation prejudiced him. *Id.* at 689. The Court "need not address both [prongs] of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). Thus, even if the Court determines that counsel's performance was outside the range of competent assistance, Defendant is not entitled to relief if counsel's conduct had no effect on the judgment. *Strickland*, 466 U.S. at 691.

When assessing counsel's conduct, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Defendant bears the burden of overcoming the presumption that the challenged conduct might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Where the claim is that counsel failed to investigate a particular issue, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

To demonstrate prejudice, Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. When a case ends in a guilty plea, the prejudice prong is

satisfied if "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

### A. Pre-Plea Representation

Defendant asserts that attorney Tilton did not provide effective assistance prior to the guilty plea. Defendant contends that Tilton did not adequately investigate his case and did not provide Defendant with documents that Defendant requested. Defendant believes that the evidence against him was not sufficient because the primary witness against him, Scott Hoeft, lied to the grand jury. Defendant believes that he was tricked by Hoeft and that the Government could not provide documentary evidence to support its loss calculation of over $8,000,000. He also believes that the Government's indictment was barred by the statute of limitations, and that his attorney should have raised the issue. Defendant's claim is meritless for several reasons.

*First*, the claim has been waived. Claims about the deprivation of constitutional rights that occur before the entry of a guilty plea are generally foreclosed by that plea. *See United States v. Broce*, 488 U.S. 563, 569 (1989); *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). The United States Supreme Court has explained:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [constitutional standards].

*Tollett*, 411 U.S. at 267. In other words, a knowing and voluntary guilty plea waives all nonjurisdictional defects in the proceedings, including a claim of ineffective assistance of counsel that does not relate to the voluntariness of the plea. *See United States v. Stiger*, 20 F. App'x 307, 308-09 (6th Cir. 2001); *Rice v. Olson*, No. 16–1125, 2016 WL 3877866, at *2 (6th Cir. July 15,

2016) ("Claims of pre-plea ineffective assistance not relating to the acceptance of the plea are waived under the . . . *Tollett* rule."); *see also United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (pre-plea ineffective assistance of counsel claims are waived).

To be knowing and voluntary, a plea should "reflect a full understanding of the direct consequences so that [it] represents a voluntary and intelligent choice among alternatives." *Moore v. United States*, 61 F. App'x 947, 949 (6th Cir. 2003) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Defendant's representations in the plea agreement and at his plea hearing indicate that his plea was both knowing and voluntary.

Defendant contends that he was "coerced" into pleading guilty because the Government sent a "target letter" to his wife, threatening to file charges against her. (*See* Mem. in Supp. of Mot., ECF No. 51, PageID.319.) The record indicates that Defendant's attorney sought to obtain information from Defendant's wife about a month before the plea hearing, and then the Government sent her a target letter. Plaintiff states that it sent her a target letter because of "her involvement in some of the loans that were not paid off on her residence or their jointly owned residences." (Response, ECF No. 67, PageID.643-644.)

Defendant's assertion that he was coerced is contradicted by his actions, by the signed plea agreements, and by his statements under oath at the plea hearing. If he had any misgivings about pleading guilty, he had many opportunities to express them to the Court. He did not do so. The Court will not lightly disregard Defendant's clear and unambiguous representations that he was not threatened or coerced, and that his decision to plead guilty was undertaken freely and voluntarily.

Moreover, Defendant signed a plea agreement long before his wife received a target letter from the Government. And his emails from the time of the first agreement suggest that he

was delaying a plea hearing not because he wanted to proceed to trial, but because he wanted to use his knowledge about a matter in Florida to obtain concessions from the Government, and because he was skeptical about the amount of damage caused by his conspiracy. These actions suggest that he was already inclined to plead guilty before the Government raised the specter of charging his wife with an offense. Thus, considering all the circumstances, the Government's purported threat does not undermine the validity of his plea.

In addition, Defendant's claim that his counsel failed to adequately investigate his case does not undermine the voluntary or intelligent nature of his plea. Defendant was well aware of counsel's alleged failures at the time he decided to enter his plea. According to his petition, he "begged [his] attorneys" for documents to "prove the facts of [his] case," but he did not receive them. (*See* Mem. in Support of § 2255 Mot., ECF No. 51, PageID.324.) Nevertheless, he decided to proceed with the plea. Thus, his claim challenging counsel's conduct or omissions before the plea was waived by the plea.

*Second*, Defendant's ineffective-assistance claim does not meet the *Strickland* standard. Defendant has not offered evidence sufficient to demonstrate that counsel's allegedly deficient performance prejudiced him. Defendant's assertion that the Government relied on false accusations from Hoeft to support the indictment and false information from the title insurance companies to determine the loss calculations is conclusory and unsupported. Moreover, this assertion does not demonstrate that Defendant would have gone to trial rather than pleading guilty if counsel had conducted a more thorough investigation. The purpose of a trial is to put the Government to its proofs. If Defendant truly thought that the Government could not prove its case, then the reasonable course would have been to proceed to trial rather than to accept a guilty plea.

In addition, Defendant was not prejudiced by counsel's failure to raise a statute-of-limitations defense. Defendant's assertion that the charges against him were barred by the statute of limitations is meritless. The statute of limitations for Defendant's offense is 10 years when a financial institution is affected. 18 U.S.C. § 3293(2). Otherwise, the statute of limitations is 5 years. *See* 18 U.S.C. § 3282(a). The statute of limitations runs from the commission of the offense until an indictment is returned or a criminal information is filed. 18 U.S.C. § 3293. The grand jury returned the indictment against Defendant in February 2015. According to Defendant, his conduct with Hoeft ended in "September or October 2005." (ECF No. 51-2, PageID.403; *see also* PIR 9, ECF No. 27.) Thus, the indictment was returned within 10 years after Defendant's commission of the offense.

Defendant claims that the 10-year statute of limitations in § 3293 does not apply because the true victims of his fraudulent scheme were insurance companies, not financial institutions. (Reply, ECF No. 68-1, PageID.680.) Generally, the term financial institution includes banks but not an insurance companies. *See* 18 U.S.C. § 20 (defining "financial institution"). However, § 3293 only requires that a financial institution be "affect[ed]." Courts have not interpreted this to mean that a financial institution has suffered an *actual* loss. It is enough if a financial institution suffered an increased *risk* of loss. *See, e.g.*, *United States v. Stargell*, 738 F.3d 1018, 1022-23 (9th Cir. 2013); *United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010) (finding that a "looming possibility of harm, even if ultimately not realized, was enough to *affect* the financial institutions for purposes of § 3293(2)"); *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003) (citing *United States v. Hord*, 6 F.3d 276, 282 (5th Cir. 1993); *United States v. Colton*, 231 F.3d 890, 907 (4th Cir. 2000)). *Cf. United States v. Ubakanma*, 215 F.3d 421, 426

(4th Cir. 2000) (holding that the mere fact that funds involved in the scheme were transferred into and out of accounts at financial institutions is not enough to "affect" a financial institution).

Here, the scheme Defendant was involved in put banks at increased risk of loss because they did not receive the money to which they were entitled when the homes securing their mortgages were sold, or they were misled about the value of their collateral when issuing new loans because they were not told about existing liens, or their mortgage interests were not properly recorded. They ultimately received compensation from the title insurance companies, but they were still subject to an increased risk that they would suffer a loss. Defendant himself acknowledged this risk at the plea hearing:

> The ultimate loss came to the insurance – to the title insurance companies because they insured the title, but throughout the process other people were at risk. The workers were at risk, homeowners were at risk, banks were at risk.

(Plea Hr'g Tr. 13.)

Defendant's reliance on *United States v. Agne*, 214 F.3d 47 (1st Cir. 2000) is misplaced. In that case, the court found that § 3293 did not apply because the bank suffered "no realistic prospect of loss"; any withdrawals from the bank were fully protected by a letter of credit against an account with sufficient funds to reimburse the withdrawals shortly after they were made. *Id.* at 52. In contrast, there was no similar guarantee in Defendant's case that the banks could recover what was due to them. They had to institute foreclosure actions and seek reimbursement from the title insurance companies. Those actions might have been unsuccessful for any number of reasons.

Thus, any objection to the charges based on the statute of limitations would have been futile. Defendant's attorney was not obligated to raise a futile objection, and was not ineffective for failing to do so. In short, Defendant has not demonstrated that counsel performed

deficiently and/or that Defendant would have insisted on going to trial if not for counsel's deficient performance.

*Third*, the unambiguous statements that Defendant made at his plea hearing undermine the facts on which his ineffective-assistance claim is based. His claim that further investigation would have shown that he is not responsible for the fraudulent conduct and the extent of the loss with which he was charged is flatly contradicted by his sworn admissions at the plea hearing. Defendant gave specific testimony about the nature of his conduct and even indicated that he was not surprised that the total loss suffered by the title insurance companies was approximately $8,000,000. And contrary to his present assertion that he was tricked by Hoeft, he testified under oath that he knew what he was doing. Sworn statements to the court carry a strong presumption of truthfulness. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977). He has not overcome that presumption.[1]

Similarly, Defendant's claim that counsel did not perform adequately before the plea is flatly contradicted by his own representations at the plea hearing, when he affirmatively represented that he had a thorough opportunity to investigate the charges and that he was satisfied with Tilton's representation of him.

Thus, for all the foregoing reasons, Defendant's claim that attorney Tilton provided ineffective assistance before the plea hearing is meritless.

## B. Sentencing Representation

Next, Defendant asserts that attorney Nieuwenhuis provided ineffective assistance of counsel after the plea hearing and before sentencing. Much of Defendant's claim concerning

---

[1] Some of the documents Defendant has filed with the Court, which were no doubt part of the Government's evidence against Defendant, also demonstrate his involvement in a scheme with Hoeft to delay or withhold payments due at closing. (*See* Emails, ECF No. 51-3, PageID.467-474; *see also* Gahan Email to Hoeft, ECF No. 68-1, PageID.668 ("You are holding the proceeds from the Fri Close, right?").)

Nieuwenhuis' conduct covers the same territory discussed in the previous section. In essence, Defendant contends that he relayed some of his objections about the ineffective assistance of Tilton to Nieuwenhuis and she did not take any action to correct them. For instance, she did not attempt to withdraw Defendant's plea. For the reasons discussed in the previous section, Defendant has not shown that Tilton was ineffective for failing to further investigate his case or to provide certain documents to Defendant, and there is no merit to Defendant's assertion that the charges against him were barred by the statute of limitations. Thus, Nieuwenhuis was not ineffective for failing to respond to Defendant's concerns about Tilton's conduct.

Defendant also contends that Nieuwenhuis should have objected to statements in the PIR, particularly those concerning the amount of the loss for which he was responsible. However, as indicated in correspondence submitted by Defendant to the Court (ECF No. 51-2), Nieuwenhuis correctly advised Defendant that he had already pleaded guilty to the relevant facts, including the amount of the loss. If he attempted to recant any of his statements to the Court, or challenged statements in the PIR regarding details he had already admitted, he risked exposing himself to a finding that he committed perjury and losing credit for acceptance of responsibility. (*See* Nieuwenhuis Email to Def., ECF No. 51-2, PageID.410.) That advice was perfectly reasonable.

Moreover, Defendant was not prejudiced by the lack of an objection. At sentencing, Defendant received a 20-point increase in his offense level because his offense involved a loss of more than $7,000,000. (*See* PIR, ECF No. 32, PageID.153 (citing U.S.S.G. § 2B1.1(b)(1)(K)).) Defendant contends that the only losses that should have been attributed to him were the payments made by the title insurance companies to banks rather than to individuals and construction companies, because the latter are not financial institutions. However, this

21

argument conflates the statute defining his offense with the sentencing guidelines. The sentencing guidelines do not limit "loss" to that which is sustained by financial institutions.

For purposes of the sentencing enhancement for fraud offenses, loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i). By fraudulently withholding proceeds for existing liens, or fraudulently concealing the existence of liens, it is reasonably foreseeable that the pecuniary harm that could result is equivalent to the amount of the liens that were concealed or not paid. Ultimately, the title insurance companies had to reimburse others for those amounts, but those losses are attributable to Defendant and Hoeft's conspiracy.

In other words, Defendant is criminally liable because the scheme in which he participated put financial institutions (among others) at risk of loss. The banks did not ultimately suffer a loss; the loss was borne by the insurance companies. Nevertheless, Defendant is eligible for the sentencing enhancement in U.S.S.G. § 2B1.1 to the extent of the pecuniary harm suffered by the insurance companies because that loss was a reasonably foreseeable result of his conspiracy with Hoeft. *See United States v. Jimenez*, 513 F.3d 62, 87 (3d Cir. 2008) ("Receipt of insurance proceeds merely shifts the loss, it does not reduce it . . . . The loss to the insurance company is therefore a direct loss that was properly included within the loss calculations."). Thus, there is no support for Defendant's objections to the amount of loss.

Finally, Defendant's claim about Nieuwenhuis' allegedly ineffective assistance is undermined by his statement at his sentencing hearing that he was satisfied with her representation of him. He made this statement even though he was aware of her alleged deficiencies.

Accordingly, for all the foregoing reasons, Defendant's claim of ineffective assistance of counsel is meritless.[2]

**Ground Two: Prosecutorial misconduct**

Defendant further claims that the Government did the following: "tricked" him into signing a plea agreement to obtain his cooperation for an investigation in Florida; threatened to prosecute his wife to get him to plead guilty; took Hoeft's statements at face value without investigating them; did not give Defendant the same opportunity to cooperate that it gave Hoeft; failed to provide bank statements and other documents to support the charges; and violated the Federal Rules of Criminal Procedure by failing to file a complaint before proceeding to an indictment.

For the reasons discussed in Ground One, virtually all of these claims are waived by the plea. The only one that is not waived is Defendant's contention that the Government threatened to prosecute his wife in order to coerce him to plead guilty. That claim, however, is meritless for the reasons stated in Ground One.

Moreover, the Government was not required to investigate Hoeft's statements, to provide specific documents to support its charges, or to give Defendant the same opportunity to cooperate that it gave Hoeft. Nor was it required to file a complaint before proceeding to an indictment. *See Young v. United States*, No. 4:06-cr-14, 2013 WL 4679931, at *14 (E.D. Tenn. Aug. 30, 2013) (explaining that "a criminal case may be initiated by a criminal complaint under Rule 3, an information issued by the United States Attorney under Rule 7, *or* an indictment issued by a grand jury pursuant to Rule 7") (emphasis added).

---

[2] In supplements to the motion for relief under § 2255, Defendant contends that his appellate attorney was ineffective for not raising the other issues discussed herein. (*See* ECF No. 80.) As these other issues are meritless, his appellate attorney was not ineffective for failing to raise them.

In addition, it was not improper for the Government to seek Defendant's cooperation in connection with his plea agreement. The plea agreement expressly stated that the prosecutor would decide whether to seek a reduction of Defendant's sentence if Defendant "materially and substantially assists the Government in the investigation and prosecution of others." (ECF No. 22, PageID.75.) The agreement also stated that the determination of whether Defendant provided substantial assistance would be made "in the sole discretion of the U.S. Attorney's Office," and that the Government was not promising to seek a reduction of sentence. (*Id.*) Defendant does not suggest that the Government failed to comply with the plea agreement. Thus, his claim that the prosecutor acted improperly is groundless and meritless.

In short, for all the foregoing reasons, Defendant's prosecutorial misconduct claim in Ground Two is meritless.

*Ground Three:* **Pressing False Charges, False Imprisonment, Obstruction of Justice**

In a supplement to his motion under § 2255, Defendant adds a third ground for relief. (ECF No. 56.) He asserts that "COUNT THREE is the combined violations of my rights as previously stated (Counts one and two) . . . . Additionally, COUNT THREE should be considered: PRESSING OF FALSE CHARGES, FALSE IMPRISONMENT, OBSTRUCTION OF JUSTICE." (ECF No. 56-1, PageID.528.)

Defendant's basis for these claims is his belief that he is not criminally responsible because the charges are barred by the statute of limitations and because the "victims" in his case are not financial institutions. This belief is incorrect for the reasons discussed in Ground One. In addition, Defendant's challenge to the validity of the charges was waived by his plea. Thus, he cannot complain that the Government pressed false charges, that he is falsely imprisoned, or that justice has been obstructed. Accordingly, Ground Three is meritless.

Because all of the claims in Defendant's motion under § 2255 have no merit, the motion will be denied.

## IV.  OTHER MOTIONS

Also before the Court are several other motions filed by Defendant, including motions for release on bond (ECF Nos. 54, 76), motions for discovery (ECF Nos. 63, 64, 74, 78, 83), motions to appoint counsel (ECF Nos. 52, 88), and a motion for a timely ruling (ECF No. 92).

### A.  Bond

Defendant is not entitled to release on bond while the Court considers his motion for relief under § 2255, and because he is not entitled to relief, his motions for release on bond will be denied as moot.

### B.  Discovery

The Court has reviewed Defendant's requests for discovery and finds that discovery is not warranted in this matter.  Defendant's requests are generally based on his beliefs that his attorney, Sean Tilton, was working with the prosecutor by withholding documents and seeking information from Defendant's wife, that Scott Hoeft and the title insurance companies were lying, that the Government could not prove its case, that the Government did not follow the federal rules of procedure when charging him, that the charges against him were barred by the statute of limitations, and that the Government coerced him into pleading guilty.  Further discovery on these issues will not aid Defendant's claims.  For the reasons already discussed, Defendant waived his ability to challenge the Government's case against him, and to challenge alleged deficiencies in his counsel's performance that were not tied to the validity of his plea.  In addition, his actions and sworn statements indicate that his plea was a voluntary decision.  In short, the record conclusively demonstrates that Defendant is not entitled to relief.

### C. Appointment of Counsel

Defendant has also filed several motions seeking appointment of counsel. There is no constitutional right to appointed counsel in collateral proceedings like this one. *Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) (citing *McCleskey v. Zant*, 499 U.S. 467, 495 (1987)). Rather, a federal court has the discretion to appoint counsel in a habeas proceeding where "the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B); *Mira v. Marshall*, 806 F.2d 636, 638 (6th Cir. 1986). A court must appoint counsel if an evidentiary hearing is required to resolve a defendant's claims. Rule 8(c), Rules Governing § 2255 Proceedings. Having decided that the files and records in this case conclusively show that Defendant is not entitled to relief under 28 U.S.C. § 2255, the Court, in its discretion, further determines that neither the interests of justice nor due process require the appointment of counsel.

### D. Motion for a Ruling

Defendant's motion for a timely ruling will be denied as moot.

## V. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court must assess whether to issue a certificate of appealability. To warrant the grant of a certificate of appealability, Defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Sixth Circuit Court of Appeals has disapproved of the issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted." *Id.* at 467. The Court has analyzed Defendant's claims and finds that reasonable jurists would not find the Court's disposition of these claims debatable or wrong. Accordingly, the Court will deny a certificate of appealability.

## VI. CONCLUSION

For the reasons stated herein, the Court will deny Defendant's motion for relief under § 2255 and denies a certificate of appealability as to each issue asserted. The Court will also deny Defendant's motions for release on bond, for appointment of counsel, for discovery, and for a timely ruling.

An order will issue consistent with this Opinion.


Dated:    October 30, 2018            /s/ Janet T. Neff
                                     Janet T. Neff
                                     United States District Judge